IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

F I L E D

JUL 26 2012

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

DEBORAH ANN JOHNSON,       )
                          )
      Plaintiff,           )
                          )
      v.                   )          CIVIL NO. 3:11CV346-REP
                          )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security, )
                          )
      Defendant.           )
                          )

## REPORT AND RECOMMENDATION

Deborah Ann Johnson ("Plaintiff") alleges that her depression, migraine headaches and carpal tunnel have disabled her from working. She applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an amended onset date of November 2, 2006. Plaintiff filed her application for benefits on March 31, 2006, originally alleging that she had been disabled since January 2, 2004, due to episodic blindness in her right eye associated with migraine headaches. After the Appeals Council remanded the Commissioner's first decision, Plaintiff's claim was presented again to an administrative law judge ("ALJ"), who also denied Plaintiff's request for DIB and SSI benefits. The Appeals Council subsequently denied Plaintiff's request for review of that second decision on April 28, 2011. Plaintiff now challenges the second ALJ's denial of benefits, asserting a lack of substantial evidence supporting his determination. (Pl.'s Mem. of Points and Auth. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8-16.) Specifically, Plaintiff argues that the ALJ improperly evaluated her credibility and the opinions of three doctors and, consequently, failed to pose an accurate hypothetical to the vocational expert ("VE"). (Pl.'s Mem. at 8-16.)

In his decision, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that she could lift less than ten pounds with her left hand and not use her hand repetitively or constantly. (R. at 14.) Nonexertionally, she had the capacity to understand, remember and carry out simple instructions and perform low stress jobs requiring little decision making and minimal interaction with others. (R. at 14.) In his RFC evaluation, the ALJ found Plaintiff's subjective complaints and limitations less than fully credible, because they were internally inconsistent and out of proportion with, or unsupported by, the medical evidence of record. (R. at 12-17.) In evaluating the medical records of Plaintiff's treating physician and two consulting psychologists, the ALJ assigned less than controlling weight to each of their opinions based on their inconsistency with the record. (R. at 17-18.) Instead, the ALJ incorporated only those parts of the opinions supported by substantial evidence within the record. (R. at 17-18.)

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Commissioner's final decision denying her applications for benefits. This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record, and for the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF No. 12 &13) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## I. MEDICAL HISTORY

Plaintiff's chief complaints are that the ALJ did not properly weigh any of the three physicians' opinions or properly evaluate Plaintiff's credibility and that the ALJ's determinations were ultimately unsupported by substantial evidence. (Pl.'s Mem. at 8-16.) Because much of the ALJ's findings depended on his credibility evaluation and the doctors' level of consistency, the evidence of record is thoroughly summarized below.

### A.    Plaintiff's Work History

Plaintiff is 44-years-old with formal education through the tenth grade. (R. at 95-96.) She was last employed in 2002 as a presser for a cleaner. (R. at 48, 287.) Aside from several jobs as a presser, Plaintiff also worked as a housekeeper for a few hotels. (R. at 283-87.) According to her FICA earnings summary, Plaintiff has worked for approximately twenty different employers since 1999, (R. at 283-87), many of which were obtained through a temporary agency (R. at 55). Plaintiff has worked in various unskilled capacities and settings, including at a supermarket, fast food restaurant, dollar store and Salvation Army. (R. at 52-54.)

### B.    Plaintiff's Medical History

#### 1.    William H. Benson, M.D., Ophthalmologist

In July 2006, William H. Benson, M.D., an ophthalmologist, evaluated Plaintiff concerning episodes of vision loss, which Plaintiff alleged had caused her migraine headaches. (R. at 412.) Dr. Benson noted an "essentially normal" examination where Plaintiff was found to have 20/60 vision in each eye without correction and 20/40 vision with correction. (R. at 412-14.) Plaintiff advised the doctor that she "need[ed] to lay down in a dark room for the migraine to go away," and that this occurred frequently since the age of thirteen. (R. at 412.) Dr. Benson

noted that the headaches "respond[ed] to [T]ylenol according to her application." (R. at 414.) Plaintiff deferred obtaining prescription glasses. (R. at 413.)

### 2.   Tucker Pavilion

From November 2 to November 6, 2006, Plaintiff was hospitalized at Tucker Pavilion, a mental health facility of Chippenham and Johnston-Willis Hospitals, Inc., because she was "depressed and stressed." (R. at 507.) Plaintiff, then 39-years-old, reported a decreased interest in life and decreased sleep, appetite, socialization and pleasure. (R. at 507.) This was Plaintiff's first psychiatric hospitalization and she denied any history of mental illness. (R. at 507.) Plaintiff tested positive for marijuana, cocaine and alcohol use. (R. at 507.) Plaintiff's mental status examination administered by psychiatrist Nestor C. Vozza, M.D., revealed that Plaintiff was "averagely" groomed, alert and well-oriented with normal psychomotor activity, and made fair eye contact. (R. at 507.) Her mood and affect were depressed, but she denied any suicidal ideation and showed no evidence of psychosis. (R. at 507.) Plaintiff's discharge diagnoses were major depression (recurrent) and polysubstance abuse. (R. at 508.) She was prescribed Zoloft and Soma. (R. at 508.)

### 3.   Nestor C. Vozza, M.D., Psychiatrist

From January to October 2007, Dr. Vozza examined Plaintiff on four more occasions. (R. at 444-47.) In January, Dr. Vozza changed Plaintiff's diagnosis to depression, not otherwise specified. (R. at 447.) Plaintiff also relayed decreased sleep, an "ok" appetite and no suicidal ideation. (R. at 447.) Plaintiff was prescribed Zoloft and Ambien, and was advised to return in three months. (R. at 447.) Plaintiff returned to Dr. Vozza for her depression again in June and reported that her sleep was "ok" as a result of the medicine and again confirmed no suicidal inclinations. (R. at 446.) Her diagnosis, prescription and follow-up instructions remained the

4

same. (R. at 446.) The final two visits with Dr. Vozza were substantially the same. (R. at 444-45.) Thereafter, Dr. Vozza closed his outpatient practice. (R. at 499.)

### 4.     Linda Dougherty, Ph.D., Clinical Psychologist

In November 2007, Dr. Dougherty independently examined Plaintiff. (R. 435-39.) She diagnosed Plaintiff with major depressive disorder that was recurrent and severe with psychotic features, and she assigned the Plaintiff a Global Assessment of Functioning ("GAF")[2] of 50[3]. (R. at 438.) Dr. Dougherty noted that Plaintiff was "generally credible" and cooperative, "but exhibited poor effort and motivation" throughout the evaluation. (R. 435-39.) Plaintiff reported that she was independent in her daily activities — bathing, grooming, dressing, preparing simple meals, cleaning, performing routine household tasks, supporting herself with food stamps and child support payments, and managing money. (R. at 436.)

Regarding Plaintiff's mental status, Dr. Dougherty found her alert and fully oriented with normal psychomotor activity, gait, posture, speech, language and thought content. (R. at 436.) Plaintiff's thought processes were generally clear and coherent, and her eye contact was minimal. (R. at 436.) Despite endorsing passive suicidal ideation, Plaintiff had no plan or method and said she would not kill herself. (R. at 436-37.) Plaintiff's affect was flat and mood depressed, and she reported hearing voices and seeing demons, but denied delusions. (R. at 437.) Plaintiff reported feeling sad and nervous most of the time, difficulty concentrating and decreased interest and enjoyment in activities. (R. at 437.) Plaintiff's attentional processes and ability to mentally manipulate information were found impaired secondary to, and most likely

---

[2] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter "*DSM-IV*").

[3] A GAF of 50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

affected by, poor effort and motivation. (R. at 437.) Intellectual ability was difficult to measure, because Plaintiff "answered 'I don't know' to most questions." (R. at 437.)

Dr. Dougherty opined that Plaintiff could perform simple and repetitive tasks, but would likely have difficulty maintaining regular attendance in the workplace and completing a normal workday, because of her "[d]epression and related poor motivation." (R. at 438.) She would therefore require additional supervision to complete work tasks on a consistent basis. (R. at 438.) Further, Dr. Dougherty asserted that Plaintiff would have difficulty understanding and accepting instruction, interacting with co-workers and dealing with usual competitive work stressors. (R. at 438-39.)

### 5.   Barrington Bowser, Jr., M.D., Internist

Between March and July 2009, internist Barrington Bowser, Jr., M.D., treated Plaintiff over the course of three office visits. Plaintiff's March visit addressed a vaginal cyst. (R. at 475.) In April, Plaintiff's daughter called Dr. Bowser's office regarding her mother's refills of Promethazine and pain medications, because Plaintiff was in jail. (R. at 474.) In June, Plaintiff returned for a follow-up appointment and prescription refills. (R. at 471-73.) Dr. Bowser noted pain in Plaintiff's hands and headaches. (R. at 471-73.) During her final visit with Dr. Bowser in July, Plaintiff again complained of pain in both hands for which she needed more promethazine. (R. at 470.) She also reported that she was attempting to receive disability and worked in childcare. (R. at 470.) During each visit, Dr. Bowser diagnosed Plaintiff with, among other things, depression. (R. at 470, 473, 477.) Also in July, Dr. Bowser completed two forms concerning Plaintiff's disability claim — a "Medical Assessment of Ability to do Work-Related Activities" form and a "Memo Regarding Onset Date of Disability of Patient." (R. at 462-67.)

In the "Medical Assessment of Ability to do Work-Related Activities" form, Dr. Bowser marked that Plaintiff had poor to no ability to relate to co-workers, deal with the public, deal with work stressors, function independently, maintain attention/concentration or use judgment. (R. at 465.)  He also opined that Plaintiff had poor to no ability to understand, remember and carry out complex or detailed job instructions; fair ability to follow work rules, and to understand, remember or carry out simple job instructions; and good ability to interact with supervisors. (R. at 465-66.)  In his "Memo Regarding Onset Date of Disability of Patient," Dr. Bowser noted that Plaintiff had major depression, poor coping skills and poor interaction. (R. at 462.)

### 6.    Penny Sprecher, Ph.D., Clinical Psychologist

On May 12, 2010, clinical psychologist Penny Sprecher, Ph.D., independently examined Plaintiff. (R. 518-26.)  She diagnosed Plaintiff with depressive disorder, not otherwise specified. Dr. Sprecher also assigned Plaintiff a GAF of 50. (R. at 524.)  According to Dr. Sprecher, Plaintiff was cooperative and appeared honest in describing herself as having depression, but also wrote that Plaintiff "may even [have] exacerbate[d] her symptoms for secondary gain." (R. at 525.)  Dr. Sprecher noted that "it was likely that [Plaintiff] did not do much to help herself when it comes to her feelings of helplessness and hopelessness." (R. at 524.)

Regarding her functioning, Plaintiff reported to Dr. Sprecher that she "attempt[ed] to do her own cleaning such as dusting, vacuuming and laundry," but relied on public transportation because she did not drive anymore. (R. at 523.)  Dr. Sprecher found Plaintiff attentive, tearful and sad, but fully oriented with adequate thought organization. (R. at 521-22.)  Plaintiff reported frequent crying spells, difficulty sleeping, poor energy levels, paranoia and keeping to herself. (R. at 522.)  She also reported auditory hallucinations "all the time," some telling her to "kill

[her] mom." (R. at 522.) Plaintiff told Dr. Sprecher that she was admitted to the hospital in 2007 after combining alcohol with sleeping medications in a suicide attempt. (R. at 522.) Plaintiff was also "somewhat vague" in many of her responses. (R. at 521-22.) Dr. Sprecher noted that Plaintiff's memory and recall was fair, her judgment and reasoning was poor, her ability to think abstractly was "nil" and her self-confidence was low. (R. at 522-23.) Regarding her personality assessment, Dr. Sprecher found moderate feelings of helplessness and hopelessness, limited coping skills leading to impulsive behavior and poor judgment caused by not thinking before acting. (R. at 523-24.)

Dr. Sprecher opined that Plaintiff could perform simple, repetitive tasks and understood simple instructions. (R. at 525.) While the Plaintiff presented no real risk of becoming physically aggressive, she nonetheless was likely to come in conflict with others and, therefore, would relate better with a small group of co-workers. (R. at 525.) Dr. Sprecher further opined that Plaintiff would require breaks during the day, because "she complain[ed] of ongoing problems with carpal tunnel" and fatigue due to limited sleep. (R. at 525.) Dr. Sprecher also opined that Plaintiff would have difficulty managing stress. (R. at 525.)

## II. TESTIMONIAL EVIDENCE

A.    **Plaintiff's Testimony**

Plaintiff testified in three hearings and submitted four daily activities forms since her amended onset date of disability — November 2, 2006.

### 1.    Hearings

During her August 2007 hearing, Plaintiff testified that she could no longer work, because her bones ached, she was depressed, and her right eye had periods of blindness related to migraine headaches that she had every other day. (R. at 97-101.) Although the headaches lasted

8

for "like three hours," Plaintiff said she slept them off with Ambien prescribed by her doctor. (R. at 102.) When asked if she had any problems walking or standing, Plaintiff testified that her legs ached "all the time," but that she fought through it for exercise purposes. (R. at 100-01.) Plaintiff denied an alcohol problem and responded "[n]o" when asked if she had taken "[a]ny street drugs in the past 15 years." (R. at 100.) Plaintiff reported that she took Zoloft for depression, Ambien as a sleep aid and carisoprodol for backaches. (R. at 102-03.) Finally, Plaintiff told the ALJ that, in the nine months after being released from Tucker Pavilion in November 2006, she saw a therapist — either Dr. Vozza or Karen Hasbrouck of Insight Physicians — every two weeks. (R. at 106.)

During her August 2009 hearing, Plaintiff reiterated that her right eye had periods of blindness related to migraine headaches which she experienced every other day and that she was prescribed Zoloft for "major depression." (R. at 63-64.) When asked how long the migraines lasted, Plaintiff answered three days, but then clarified that "it might last me three days and I have to sleep it off." (R. at 69.) Plaintiff confirmed that she could read and write, but had a problem concentrating. (R. at 63.) Plaintiff related that she had carpal tunnel syndrome in her left upper extremity, which limited her ability to lift and grasp heavy objects. (R. at 65-66.) She complained of crying spells every other day and claimed that her feet would swell and that she could only stand or walk for five to ten seconds at a time. (R. at 65-66.) When asked by the ALJ why she missed work in the past, Plaintiff said it was due to eye pain and that she had no pain medication for it because of her Hepatitis B. (R. at 70-71.) When asked by her attorney why she missed work, Plaintiff testified that she had major depression and stress, a problem concentrating, difficulty getting along with supervisors and co-workers and difficulty getting out of bed clothes and out of the house. (R. at 71.) When asked by the ALJ about her current

experience with suicidal thoughts, Plaintiff was vague, stating she suffered them "sometimes . . . when it come to my mind." (R. at 75-76.) She claimed to have advised Dr. Bowser of these thoughts "all the time." (R. at 75-76.)

During her February 2010 hearing, Plaintiff clarified for the ALJ that her migraines occurred every other day and lasted, on average, five to six hours. (R. at 35.) Plaintiff also clarified that she was confused in her previous hearing when she stated that she could only walk or stand for five to ten seconds; instead, she "just don't [sic] know how long" she could stand or walk. (R. at 43.) Plaintiff reiterated that, due to depression, she only left the house about twice per week, and went to church "sometimes twice a month," but had not gone at all in about two months. (R. at 45-46.) Plaintiff said she was sometimes confused by church sermons and the contents of television shows. (R. at 46.)

### 2. Daily Activity Forms

On each Activities of Daily Living ("ADL") questionnaire, Plaintiff confirmed that she was able to take care of her personal needs without assistance, except for occasionally needing a reminder to take her medications. (R. at 322, 326, 341, 402.) In 2009, Plaintiff indicated that she lived alone, could perform a little housework on her own, made sandwiches (but not cook), used public transportation and managed her finances with her daughter's help. (R. at 340-43, 401-04.) However, on account of her depression, Plaintiff relied on her daughter for help with many household chores, cooking most of her meals and doing all of her grocery shopping. (R. at 340-43, 401-04.) Plaintiff indicated that she no longer drove, read or regularly attended church. (R. at 340-43, 401-04.) In contrast, her earlier answers pertaining to her ADLs (January and July, 2007) related that Plaintiff could perform household chores more independently, cook

simple/convenient meals herself, drive a car, attend church regularly and read most sections of the newspaper on a daily basis. (R. at 321-28.)

## B.   The VE's Testimony

During Plaintiff's last hearing (February 2010), the ALJ posed a hypothetical to vocational expert Laurie Colin. The ALJ asked the VE whether jobs existed in the national economy for a person who could perform light work, lifting less than ten pounds with her left upper extremity (using it frequently but not repetitively or constantly), and where that person could understand, remember and carry out simple instructions and perform low stress jobs requiring little decision making and no more than minimal interaction with others. (R. at 48.) The hypothetical also considered Plaintiff's age, education and work experience. (R. at 48.) The VE established that there existed in the national economy (and specifically in Virginia) three jobs that Plaintiff could perform: press operator, cafeteria attendant and housekeeper. (R. at 49.) The ALJ then asked the VE how Dr. Bowser's assessment would affect Plaintiff's ability to perform those jobs. (R. at 50.) The VE established that she would be unemployable based on Dr. Bowser's opinion that Plaintiff had "no ability to function independently, maintain attention of concentration, use judgment, [or] deal with work stressors." (R. at 50.) The VE also established that Plaintiff's subjective complaints would render her unemployable, "primarily due to the inability to sustain physical and mental activities for an eight hour work day." (R. at 51.)

During that same hearing, Plaintiff's attorney posed additional limitations set forth in Dr. Dougherty's assessment to the VE. (R. at 51-52.) The VE responded that, considering those limitations, no jobs existed which Plaintiff could perform. (R. at 52.)

## III. PROCEDURAL HISTORY

Plaintiff protectively filed *pro se* for DIB and SSI on March 31, 2006, claiming disability due mainly to depression. Plaintiff's date last insured was December 31, 2006. (R. at 12.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[4] (R. at 145-60.) Plaintiff testified before an ALJ on August 13, 2007. (R. at 85-114.) On January 2, 2008, the ALJ issued a decision, finding that Plaintiff retained the ability to perform a limited range of light work and, therefore, was not under a disability under the Act. (R. at 132-39.) On May 30, 2008, the Appeals Council granted Plaintiff's request for review and remanded the case back to an ALJ for, among other things, further consideration of Plaintiff's alleged depression. (R. at 142-44.) After her claim was remanded to the ALJ, Plaintiff retained counsel and amended her onset date from January 2, 2004 to November 2, 2006. (R. at 56, 295.) On remand, the ALJ obtained an updated consultative psychological evaluation, (R. at 518-27), and held two more hearings at which Plaintiff and a VE testified — on August 27, 2009 and February 19, 2010. (R. at 26-84.) The ALJ issued a second decision on June 23, 2010 and again denied Plaintiff's claim for benefits. (R. at 10-19.) The Appeals Council denied Plaintiff's request for review on April 28, 2011, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (*See* R. at 1-3.)

## IV. QUESTION PRESENTED

Did the Commissioner properly evaluate the credibility of Plaintiff and support his determination with substantial evidence?

---

[4] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Did the Commissioner properly weigh the opinions of Plaintiff's treating physician and two consulting psychologists, and did he support his determinations with substantial evidence?

Did the Commissioner pose a proper hypothetical to the VE?

## V. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial

13

evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[5] 20 C.F.R. §§ 416.920(b); 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

---

[5] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[6] based on an assessment of the claimant's residual functional capacity ("RFC")[7] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5). The Commissioner

---

[6] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[7] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## VI. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability. (R. at 12.) At steps two and three, the ALJ determined that Plaintiff had the severe impairments of carpal tunnel syndrome in the left upper extremity, migraine headaches and depression, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Sub. P, App. 1. (R. at 13.) The ALJ determined that Plaintiff had the RFC to perform light work, except that she could only lift less than ten pounds with her left upper extremity (using it frequently but not repetitively or constantly). (R. at 14.) Nonexertionally — due to pain, headaches, mental disorders and related symptoms — the ALJ determined that Plaintiff could understand, remember and carry out simple instructions and perform low stress jobs requiring little decision making and no more than minimal interaction with others. (R. at 14.)

At step four of the analysis, the ALJ noted that Plaintiff had no past relevant work. (R. at 18.) At step five, after considering Plaintiff's age, education, work experience, RFC and after consulting a VE, the ALJ found that there were other occupations which exist in significant

numbers in the national economy that Plaintiff could perform. (R. at 18.) Specifically, the ALJ determined that Plaintiff, regardless of her limitations, could work as a press operator, cafeteria attendant or housekeeper. (R. at 19.) Accordingly, the ALJ concluded Plaintiff was not disabled and was employable such that she was not entitled to DIB benefits. (R. at 19.)

In evaluating and weighing the evidence, the ALJ assessed Plaintiff's subjective complaints, medical records from her treating physician Dr. Bowser and the examinations of two consulting psychologists — Dr. Dougherty and Dr. Sprecher. The ALJ determined that Plaintiff's subjective complaints and limitations were not credible, because they were out of proportion to the medical evidence and were inconsistent between hearings and other parts of the record. (R. at 15-16.) The ALJ also noted that Plaintiff's ADLs exhibited a degree of independency "inconsistent with severe symptoms precluding all work-related activity." (R. at 17.) Finally, the ALJ determined that the doctors' opinions were inconsistent and warranted only "limited" or "some" weight, not controlling weight. (R. at 17-18.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 16.) In support of her position that the ALJ's decision is unsupported by substantial evidence, Plaintiff argues that: (1) in failing to consider Plaintiff's alleged levels of participation in her ADLs, the ALJ's use of the ADLs as a factor in his credibility analysis was improper and, consequently, unsupported by substantial evidence; (2) the ALJ erred by using those "mischaracterized" ADLs again as a factor in evaluating the doctors' opinions, and the ALJ's determinations regarding the doctors' opinions are otherwise unsupported by substantial evidence; and (3) the ALJ erred by posing (and relying on) a hypothetical to the VE that did not include all of Plaintiff's limitations and was therefore inaccurate. (Pl.'s Mem. at 8-16.) The

Commissioner argues that the ALJ's final decision is supported by substantial evidence and the application of the correct legal standard and should therefore be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 29.)

## A.   The ALJ's credibility analysis is supported by substantial evidence.

### 1.   Generally

Plaintiff contends that the ALJ "simply ignored that evidence that described the levels of her participation in various 'daily activities,' impermissibly culling out only that evidence which supports a decision of 'not disabled.'" (Pl.'s Mem. at 10.) This, Plaintiff maintains, is in conflict with the precedent set forth in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951), which requires courts to consider not only evidence supporting their decision, but also evidence that may contradict their decision. (Pl.'s Mem. at 9-10.) In support of this allegation, Plaintiff scrutinizes that part of the ALJ's opinion which states: "'[Plaintiff] takes care of her own personal needs, does housework, cooks, feeds her granddaughter, works child care, drives, uses public transportation, shops, attends church, visits, reads, watches television [and] manages her own finances (Exhibits 7E-8E, 22E, 14F, 18F, and testimony).'" (Pl.'s Mem. at 9 (quoting R. at 17) (emphasis omitted).)

Plaintiff suggests that because the ALJ listed her admitted daily activities without specifically noting each correlating, alleged level of participation, he therefore failed to consider those limitations and, consequently, failed to consider "all the available evidence . . . such as evidence of the claimant's daily activities" in making his credibility finding. (Pl.'s Mem. at 10) (citing *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1995)). Plaintiff next concludes that the facts in this case are "the same" as the facts in *Windsor v. Astrue*, No. 3:06-cv-00664 (E.D. Va. filed

May 8, 2007)[8], where the court found that the ALJ did not adequately portray the plaintiff's participation level in her activities. (Pl.'s Mem. at 11.) Like *Windsor*, Plaintiff argues that her "participation in these activities is very limited and not inconsistent with her subjective complaints." (Pl.'s Mem. at 11.)

The Commissioner argues that Plaintiff fails to recognize that the ALJ did not rely solely on the basis of daily activities in evaluating Plaintiff's credibility; rather, the ALJ found Plaintiff's testimony inconsistent between the two hearings, inconsistent with other statements that she made for the record and out of proportion to the medical evidence. (Def.'s Mem. at 19-20.) The Commissioner offers several examples of alleged inconsistency or exaggeration that the ALJ used to support his credibility findings, including: blindness in her right eye; illegal drug use; ability to stand and walk; suicidal tendencies and ideation; history of depression; criminal history; hallucinations; and work history. (Def.'s Mem. at 20-24.) Defendant concludes that "the record is replete with inconsistencies and the ALJ's determination that Plaintiff was not fully credible is unequivocally supported by substantial evidence." (Def.'s Mem. at 24.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) & 416.929(a). The first step is to determine whether there is an underlying medically

---

[8] Plaintiff attached this unpublished and unreported Report and Recommendation to her Motion for Summary Judgment, EFC No. 13, exh. 2.

determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record").

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ'S evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

At step one of the two-part analysis, the ALJ found Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. (R. at 15.) At step two, however, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting

effects of these symptoms were not credible to the extent that they were inconsistent with her RFC. (R. at 15.) The ALJ found that Plaintiff's testimony regarding her symptoms and related limitations was "inconsistent between the two hearings, inconsistent with other statements she made for the record and out of proportion to the medical evidence." (R. at 16.)

The ALJ offered several examples to support his credibility determination, including the lack of objective medical evidence to support Plaintiff's alleged periodic blindness, carpal tunnel syndrome, standing and walking limitations, and severity of headaches. (R. at 16.) The ALJ found Plaintiff's nonexertional, depression-related complaints and her GAF score of 50 to be out of proportion with her medical treatment. (R. at 16.) He noted that Plaintiff required no further inpatient hospitalizations, she had not been referred to a mental health specialist, her symptoms responded to the medications prescribed by her primary care physician, and objective findings on mental status examinations did not support the alleged severity of her symptoms. (R. at 16.) Plaintiff at times presented a depressed mood, flat affect and impaired attention secondary to poor effort and motivation; however, her psychomotor was unremarkable, she did not appear psychotic and her judgment, memory and attention were often normal. (R. at 16, 436-37.)

The ALJ also gave examples of Plaintiff's inconsistency. First, Plaintiff stated she could not work due to vision issues, (R. at 70, 289), but later testified that she stopped working because she was depressed (R. at 15, 33-34). Plaintiff stated that she could only stand and walk for five to ten seconds at a time, but in later testimony said she could stand and walk "ok." (R. at 15, 43, 66.) Plaintiff in one hearing advised that her headaches lasted, on average, three days, but months later testified that they lasted through the night and sometimes five to six hours during the day. (R. at 15, 34-35, 69.) Finally, the ALJ noted that Plaintiff denied illegal drug use in the past five or six years when, in fact, the record showed that she used cocaine and marijuana

immediately before her 2006 hospitalization. (R. at 13, 56, 507-08.) Plaintiff also denied drug

use during her 2007 hearing and to Dr. Dougherty. (R. at 100, 436.) It is therefore apparent that,

before even discussing Plaintiff's ADLs, the ALJ determined Plaintiff's credibility after

considering a broad array of testimony, providing specific instances of inconsistency and

disproportionality.[9]

## 2. Plaintiff's ADL's and *Windsor*

Plaintiff relies on *Windsor* to argue that the ALJ improperly used her ADLs as a factor in

his credibility determination, thereby rendering it unsupported by substantial evidence. (Pl.'s

Mem. at 8-11.) Plaintiff suggests that because the ALJ referenced Plaintiff's ADLs generally, he

must have "simply ignored" her alleged levels of participation in those activities. (Pl.'s Mem. at

8-10.) However, in his credibility discussion, the ALJ cited to the very exhibits in the record that

contain both the general activities and the Plaintiff's specific alleged limitations. (R. at 17.)

Therefore, the ALJ considered those limitations in his analysis by reference. Moreover, because

the ALJ considered the ADLs in conjunction with the analysis discussed above which, on its

own, is supported by substantial evidence, the ADLs were not dispositive in determining her

credibility.

Finally, *Windsor* is distinguishable from the instant case. In *Windsor*, the ALJ failed to

support his reasoning for *any* factor that he used in evaluating the plaintiff's credibility and the

medical opinions. *Windsor*, No. 3:06-cv-664 at pp. 9-13. Though the ALJ concluded that the

plaintiff's subjective complaints were unsupported by objective medical evidence and were

inconsistent with other evidence of record, the *Windsor* court found that the ALJ did "not

---

[9] While the ALJ mentioned that Plaintiff related that she took care of her grandchildren, "in light of her amended onset date of disability, and giving her the benefit of the doubt," he did not consider it. (R. at 16-17.)

provide any specifics to inform the Court what inconsistencies he is referring to and what subjective complaints are not supported by the medical evidence of record." *Id.* at 13. Hence, the court in *Windsor* scrutinized the ALJ's conclusion regarding the plaintiff's ADLs as part of a continuing effort to find support for his credibility determination. *Windsor* is inapplicable here, however, because the ALJ's credibility determination was buttressed by Plaintiff's inconsistent statements, irrespective of his additional scrutiny regarding her ADLs. Therefore, substantial evidence exists to support the ALJ's credibility determination.

**B.     The ALJ's assignments of less than controlling weight for each doctor's opinion was proper and supported by substantial evidence.[10]**

Plaintiff initially alleges that the ALJ improperly used "mischaracterized" ADLs to evaluate the doctors' opinions, thereby rendering those evaluations unsupported by substantial evidence. (Pl.'s Mem. at 12.) However, the ALJ properly assessed Plaintiff's ADLs, thus rendering this argument moot.

Second, Plaintiff argues that when her three doctors' opinions are considered pursuant to the factors enumerated in 20 C.F.R. secs. 404.1527 and 416.927,[11] "there is nothing that justifies disregarding them." (Pl.'s Mem. at 12-13.) Plaintiff asserts that the opinions are "mutually supportive," "remarkably consistent," and contain "no internal inconsistencies." (Pl.'s Mem. at 13.) Plaintiff further advises that Drs. Sprecher and Dougherty are both "specialists" pursuant to 20 C.F.R. secs. 404.1527(d)(5) and 416.927(d)(5). (Pl.'s Mem. at 14.)

---

[10]  Regarding two non-treating, state agency opinions, the ALJ assigned them little weight, because "evidence received at the hearing level shows that the [Plaintiff was] more limited than [they had] determined." (R. at 18.)

[11]  Those factors include:  the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability (within the record) of the treatment source's opinion; consistency of the opinion in relation to the record as a whole; specialization of the treatment source relative to the type of medical issues in his or her opinion; and other factors brought to the SSA's attention. 20 C.F.R. §§ 404.1527 & 416.927.

In contrast, the Commissioner argues that the ALJ properly assigned less than controlling weight to Plaintiff's doctors' opinions. (Def.'s Mem. at 25-28.) The Commissioner asserts that the ALJ properly assigned limited weight to Dr. Bowser's opinion based on inconsistencies between his office notes and opinions; some weight to Dr. Dougherty's opinion based on her medical source statement, GAF score of 50 and her opinion concerning work restrictions being inconsistent with Plaintiff's medical care, response to treatment and ADLs; and limited weight to Dr. Sprecher's opinion based on a lack of support in her notes and inconsistency both internally and with other evidence. (Def.'s Mem. at 25-28.) Finally, the Commissioner explains that the "reliability of [Plaintiff's] GAF score is inherently suspect," because her subjective complaints "were obviously exaggerated."[12] (Def.'s Mem. at 26.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

---

[12] Defendant cites *DSM-IV* to explain that the GAF score incorporates both symptom severity and functioning and that when they differ, "the final GAF rating always reflects the worse of two." (Def.'s Mem. at 26 n.9 (quoting *DSM-IV* at 32-34).) Additionally, Defendant directs the Court to 20 C.F.R. sec. 404.1528(a), noting that symptoms are an individual's own description of her impairment. (Def.'s Mem. at 26 n.9.)

24

each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. § 404.1527(d)(3)-(4), (e).

The Court's role here is solely to evaluate the ALJ's decision and to determine whether the ALJ evaluated the evidence before him, as required under the Act. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004). In his decision, the ALJ summarized and evaluated each doctor's opinion. (*See* R. at 17-18.) However, he found neither had adequate support in the record nor consistency in the record to assign any of the three opinions controlling or great weight.

The ALJ did not disregard any of the doctors' opinions, but rather, incorporated many aspects of the opinions into Plaintiff's RFC. For example, the ALJ assigned Dr. Bowser's opinion "some" weight. (R. at 17.) In support of his assignment, the ALJ noted inconsistencies between the objective findings of Dr. Bowser's own treatment records and the "Medical Assessment of Ability to do Work-Related Activities" that Dr. Bowser completed. (R. at 17;

*compare* R. at 473, 77 *with* R. at 465-67.) Not only did his treatment notes fail to corroborate his

check marks, but Dr. Bowser offered no support for those inconsistent judgments. *See* 20 C.F.R.

§§ 404.1527(c)(3) and 416.927(c)(3) (advising "[t]he better an explanation a source provides for

an opinion, the more weight we will give that opinion"). Further, the ALJ noted that Dr.

Bowser's opinion was inconsistent with Plaintiff's response to treatment, her admitted daily

activities and the nature of her medical care — mainly that, Plaintiff required no further inpatient

hospitalizations and was not referred to a mental health specialist. (R. at 16-17; *see also* R. at

469-77.) In assigning some weight to his opinion, the ALJ did include Dr. Bowser's opinions

regarding simple instructions, low stress, little decision-making and minimal interaction with

others. (R. at 17.) The ALJ's refusal to assign controlling weight was reasonable and supported

by substantial evidence.

The ALJ also assigned Dr. Dougherty's opinion limited weight, because the GAF score

of 50 that she assigned Plaintiff, and her assertions that Plaintiff would have difficulty regularly

attending work and would need additional supervision, were all inconsistent with the "Medical

Source Statement of Ability to do Work-Related Activities" form that she completed. (R. at 17;

*compare* R. at 487-88 *with* 489-91.) On that form, Dr. Dougherty marked that Plaintiff had only

mild to moderate restrictions, except when attempting to perform complex tasks. (R. at 17, 489-

90.) In addition to Plaintiff's alleged severe symptoms being unsupported by objective findings

on mental status examinations, the ALJ further noted that Dr. Dougherty's findings were

inconsistent with Plaintiff's ADLs, her response to treatment and the nature of her medical

treatment. (R. at 16-17; *compare* 487-88 *with* 321-44, 401-04, 444-47, 469-77.) According to

the record, Plaintiff required no further inpatient hospitalizations and was not referred to a

mental health specialist. (*See* R. at 16-17.) The ALJ's refusal to assign controlling weight was reasonable and supported by substantial evidence.

Lastly, the ALJ assigned Dr. Sprecher limited weight, because her GAF was inconsistent with the "generally normal findings on her own examination and the claimant's admitted daily activities." (R. at 16, 18.) Moreover, Dr. Sprecher observed that Plaintiff often responded vaguely, displayed poor effort and motivation, and may even have exacerbated her symptoms for secondary gain. (R. at 521-525.) The ALJ also noted that Dr. Sprecher's opinion that Plaintiff required breaks due to fatigue from carpal tunnel syndrome lacked medical support. The inconsistency that the ALJ noted and Dr. Sprecher's comments corroborating Plaintiff's lack of credibility supported the ALJ's limited weight determination. Thus, substantial evidence supported the ALJ's weight assignments to Plaintiff's doctors' opinions.

C.     **Substantial evidence supports the ALJ's hypothetical posed to the VE, which was properly formulated.**

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be relevant or helpful. *Id.*

Plaintiff asserts that "[t]he ALJ's hypothetical failed to incorporate the limitations ascribed to [Plaintiff] by any of [her doctors]," all of whom support her disability claim. (Pl.'s Mem. at 15.) Furthermore, she asserts that when posed with a hypothetical that considered Dr. Dougherty's opinion, the VE found no jobs available for Plaintiff. (Pl.'s Mem. at 15.) Plaintiff explains that the VE also noted that Dr. Bowser's opinion would preclude all work and that the GAF of 50 that Dr. Sprecher ascribed to Plaintiff is defined, in part, as "serious symptoms . . . unable to keep a job." (Pl.'s Mem. at 15.) Essentially, Plaintiff's gravamen is that the ALJ failed to consider what "the record fairly detracts from its weight" pursuant to *Universal Camera Corp.*, 340 U.S. 474 at 487-88. (Pl.'s Mem. at 15-16.)

Plaintiff properly summarized the VE's testimony based on those hypotheticals that the Plaintiff posed. However, Plaintiff fails to recognize that the ALJ's hypothetical properly incorporated the ALJ's RFC determination. At the hearing, the ALJ asked the VE whether jobs existed in the national economy for a person who could perform light work, lifting less than ten pounds with her left upper extremity (using it frequently, but not repetitively or constantly), and where that person could understand, remember and carry out simple instructions and perform low stress jobs requiring little decision making and no more than minimal interaction with others. (R. at 48.) This question clearly corresponds to the ALJ's determination that Plaintiff has a RFC to perform light work (except that she could lift less than ten pounds with her left hand and not use her hand repetitively or constantly) and the capacity to understand, remember and carry out simple instructions, and perform low stress jobs requiring little decision-making and minimal interaction with others. (R. at 14.) The VE responded that jobs existed in the national economy for Plaintiff to perform. Therefore, the ALJ did not err at step five, as he properly formulated a hypothetical based on an RFC that was supported by substantial evidence.

## VII. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF No. 12 & 13) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ _____

_____

David J. Novak
United States Magistrate Judge

Richmond, Virginia

Date: July 26, 2012